AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **12 M 1075**
)
THE BACK BASEMENT APARTMENT LOCATED )
IN 95 COLUMBUS AVENUE, )
STATEN ISLAND, NEW YORK )

## SEARCH AND SEIZURE WARRANT

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:
THE BACK BASEMENT APARTMENT LOCATED IN 95 COLUMBUS AVENUE, STATEN ISLAND, NEW YORK

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ December 5, 2012 _____
*(not to exceed 14 days)*
☑ in the daytime  6:00 a.m. to 10 p.m.       ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge

_____
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
☐until, the facts justifying, the later specific date of _____

Date and time issued: _Nov.27, 2012 @5:25pm_       _____
*Judge's signature*

City and state:    Brooklyn, New York _____       THE HON. VIKTOR V. POHORELSKY, USMJ, EDNY
*Printed name and title*

ATTACHMENT A

I.    ITEMS TO BE SEARCHED FOR AND SEIZED FROM SUBJECT PREMISES 2, AND ANY CLOSED CONTAINERS AND ITEMS CONTAINED THEREIN:

1.    All and only records and other stored information, in whatever form kept, constituting or showing evidence and instrumentalities of instrumentalities of a conspiracy to import marijuana and conspiracy to distribute marijuana, in violation 21 U.S.C. §§ 846 and 963; a conspiracy to distribute cocaine, a conspiracy to export cocaine, and a conspiracy to import cocaine, in violation of 21 U.S.C. §§ 846 and 963; a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); the use of firearms during and in relation to drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i); an international marijuana distribution conspiracy, in violation of 21 U.S.C. § 963 and 959(c); and the knowing and intentional engagement in a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a) and (c), specifically:

a.    All documents, text messages, "chat," or instant messages, and any other electronically-stored data and cellular telephones relating to or memorializing the ordering, purchasing, storage, transportation and sale of narcotics, including U.S. currency used in the purchase and sale of narcotics, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books and/or Rolodexes containing the names and addresses and telephone numbers of persons who are customers and/or suppliers of narcotics, telephone answering pads, bank and financial records, mail envelopes and receipts, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, frequent flyer cards and statements, receipts and records, and storage records, such as storage locker receipts and safety deposit box rental records; Federal Express records and receipts;

b.    Articles of personal property evidencing the existence of a conspiracy to possess and sell narcotics, including personal address/telephone books, telephone bills, photographs, papers and documents consisting of lists of names and/or numbers, surveillance equipment, telephones, and SIM cards;

c.    Articles of personal property evidencing the
obtaining, secreting, transfer, expenditure and/or concealment of
money and assets derived from or to be used in the sale of
narcotics, including stock and bond certificates and records,
books, receipts, records, bank statements and records, business
records, money drafts, money orders and cashier check receipts,
vehicle titles, registrations, purchase documents, property
deeds, escrow papers, passbooks, bank checks, money counters,
safes and records of safety deposit boxes and storage lockers;

d.    Proceeds and articles of personal property
which are the fruits, instrumentalities and evidence of
trafficking in narcotics, including U.S. currency, negotiable
instruments and financial instruments including stocks and bonds
which are obtained from the sale of narcotics or proceeds
therefrom, as well as valuable collectible articles;

e.    Photographs of persons involved in the use,
possession, cultivation and/or trafficking of narcotics;
photographs of narcotics; and photographs of property and/or
other assets which may have been purchased or obtained with the
proceeds of drug trafficking;

f.    Documents and articles of personal property
showing the identity of persons occupying, possessing, residing
in, owning, frequenting or controlling the locations to be
searched or property therein, including keys, rental agreements
and records, property acquisition records, utility and telephone
bills and receipts, photographs, answering machines and tape
records (and their contents), Rolodexes, telephone answering
pads, storage records, vehicle and/or vessel records, mail
envelopes and receipts, correspondence, financial documents such
as tax returns, bank records, safety deposit box records,
canceled checks, and other records of income and expenditure,
credit card and bank records, and personal identification and
travel documents;

g.    Safes, duffle bags, any type of cloth bag,
gym bag, luggage, suitcases, plastic bags, zip-lock bags, and/or
large cardboard boxes that can be used in the storage,
transportation and delivery of narcotics;

h.    Indicia of occupancy, residency and/or
ownership of the premises to be searched and other premises; and

i.   Narcotics and narcotics paraphernalia, including but not limited to, scales, cutting agents, wrapping materials (including plastic bags and rubber bands), discarded wrappers and other materials used to conceal and transport narcotics, and machines used to package narcotics, such as heat-sealing machines;

j.   Firearms, explosives, ammunition, and bullet proof vests; and

k.   Any computers, computer hard drives, or other physical objects upon which computer data can be recorded (hereinafter, "COMPUTER"). All information obtained from such computers or electronic media will be maintained by the government for the purpose of authentication and any potential discovery obligations in any related prosecution. The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Section 846, including:

i.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the lack of such malicious software;

iv.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

v.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

vi.   evidence of the times the COMPUTER was used;

vii. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

viii.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER; and

ix.   contextual information necessary to understand the evidence described in this attachment;

all of which constitute evidence of the commission of, or are contraband or the fruit of the violation of Title 21, United States Code, Section 846.

II.   <u>Search Methodology to be Used</u>

The search procedure of electronic data contained in computer hardware, computer software, cellular phones and/or memory storage devices may include the following techniques and procedures (the following is a non-exclusive list, as other search techniques and procedures may be used):

1.   Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

2.   Opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3.   Scanning storage areas to discover and possibly recover recently deleted files;

4.   Scanning storage areas for deliberately hidden files;

5.   Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

       6.   Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in <u>Attachment A.I.</u>; and/or

       7.   Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in <u>Attachment A.I.</u>.

In conducting a search of electronic media storage devices authorized by the this Search Warrant, the government shall make reasonable efforts to utilize computer search methodology to search only for files, documents, or other electronically stored information constituting or showing evidence and instrumentalities of violations of a conspiracy to import marijuana and conspiracy to distribute marijuana, in violation 21 U.S.C. §§ 846 and 963; a conspiracy to distribute cocaine, a conspiracy to export cocaine, and a conspiracy to import cocaine, in violation of 21 U.S.C. §§ 846 and 963; a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); the use of firearms during and in relation to drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i); an international marijuana distribution conspiracy, in violation of 21 U.S.C. § 963 and 959(c); and the knowing and intentional engagement in a continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a) and (c).

SLT:GMP
F.#2012R01752

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

**12M1075**

UNITED STATES OF AMERICA

   - against -

THE PREMISES KNOWN AND DESCRIBED
AS THE BASEMENT OF 24 GATEWAY
DRIVE, STATEN ISLAND, NEW YORK; and

THE PREMISES KNOWN AND DESCRIBED
AS THE BACK BASEMENT APARTMENT
LOCATED IN 95 COLUMBUS AVENUE,
STATEN ISLAND NEW YORK.

- - - - - - - - - - - - - - - - - -X

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

(T. 21, U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

     ERIC TYLER, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such:

     Upon information and belief, there is probable cause to believe that there is currently concealed in THE PREMISES KNOWN AND DESCRIBED AS THE BASEMENT OF 24 GATEWAY DRIVE, STATEN ISLAND, NEW YORK ("SUBJECT PREMISES 1") and THE PREMISES KNOWN AND DESCRIBED AS THE BACK BASEMENT APARTMENT LOCATED IN 95 COLUMBUS AVENUE, STATEN ISLAND, NEW YORK ("SUBJECT PREMISES 2") (collectively the "SUBJECT PREMISES"), narcotics, firearms, scales, cutting agents, other drug paraphernalia, wrapping materials, including plastic bags and rubber bands, discarded wrappers and other materials used to conceal and transport narcotics, money counters, machines used to

package narcotics, surveillance equipment, telephones, SIM cards, currency, financial records, including rental agreements, utility bills, telephone bills and gas bills, car ownership records, safes, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks, all of which constitutes evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute narcotics.

The source of Your deponent's information and the grounds for his belief are as follows:

I.  **Introduction and Background**

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such. I have been a DEA Special Agent for approximately two years and am currently assigned to the New York Field Division of the DEA located in New York, New York. Prior to becoming a Special Agent with the DEA, I was an officer with the United States Secret Service in the Uniform Division for approximately four years. As

-2-

a Special Agent with the DEA, I am tasked with investigating narcotics trafficking, money laundering and other offenses.

2.   During my tenure with the DEA, I have participated in numerous narcotics investigations during the course of which I have conducted physical and wire surveillance, executions of search warrants, and reviews and analyses of numerous taped conversations and records of drug traffickers.   Through my training, education and experience -- which has included numerous instances of debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, conducting searches of locations where drugs and money have been found, and conducting surveillance of individuals engaged in drug trafficking -- I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.

3.   I have personally participated in the DEA investigation of the offenses referred to in this affidavit.  From that participation and from reports made to me by other law enforcement officers, I am familiar with the facts and circumstances of this investigation.  Because this affidavit is being submitted for the limited purpose of seeking a search warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I

-3-

believe are necessary to establish probable cause to support the
issuance of a search warrant of the SUBJECT PREMISES.  Except where
otherwise noted, all conversations described in this affidavit are
set forth in part and in substance only.

## II.   Description of the SUBJECT PREMISES

4.   SUBJECT PREMISES 1  is described as the basement of
a brown, single-family split-level house.  The house has a brick
stoop on the right-hand side of the house leading to a white door
that is marked "24."  There is a white garage door on the right-
hand side of the house.  The house is located near the intersection
of Gateway Drive and Stanwich Street in Staten Island, New York.

5.   SUBJECT PREMISES 2 is described as the apartment on
the basement level of a two-story, gray stucco house with white
trim.  The door to the apartment is at the back of the house, down
a set of stairs.  The door has a black-barred door on the outside,
with a white door just inside of that door.  The house is located
on the corner of Columbus Avenue and Stanwich Street in Staten
Island, New York.  The Columbus Avenue side of the house has a
single door, with a gray brick stoop and a wrought-iron railing.

## III.   Facts Supporting Probable Cause

6.   For more than one year, DEA has been investigating
an international drug trafficking organization responsible for
importing and distributing thousands of kilograms of hydroponic
marijuana from Canada.

-4-

7.     During the course of the investigation, DEA agents obtained considerable information about the drug trafficking activities of JOHN VENIZELOS, a member of the organization, from a cooperating witness ("CW1").[1]

8.     During the course of meetings with the government, CW1 admitted that s/he had been trafficking marijuana for approximately ten years.   During that period, from on or about January 1, 2007 through February 9, 2011, CW1 advised that an individual s/he knew as "John V." had provided five to ten pounds of marijuana to CW1 on a monthly basis.   DEA agents later identified the individual known as "John V." to be JOHN VENIZELOS, also known as "John V." and "Big Man."

9.     Specifically, CW1 admitted that a few weeks prior to meeting with DEA agents on February 9, 2011, s/he had obtained between seven to ten pounds of marijuana, along with its packaging, from VENIZELOS.   In accordance with CW1's practice, CW1 thereafter brought the marijuana to the residence of CW1's close friend, which was located on Hillcrest Street in Staten Island, New York. CW1 informed agents that s/he had placed a portion of the marijuana

---

[1]     CW1 has an extensive criminal history, and has pled guilty to Hobbs Act Robbery and carrying a firearm in relation to one or more crimes of violence.     S/he is cooperating with the government in the hope of receiving leniency in federal sentencing and possible entry into the Witness Security Program.   Information provided by CW1 has been corroborated by consensual recordings, information provided by confidential informants and other cooperating witnesses, and other sources of information.

under the kitchen sink of the residence, and a portion underneath the stairs connecting the first floor to the basement of the residence.  CW1 advised that s/he had recently viewed the marijuana in the same location.

10.  On or about March 25, 2011, agents searched the residence located on Hillcrest Street pursuant to a court-authorized search warrant.  At the residence, agents seized a brown pillow case containing a green, leafy substance that later tested positive for 3.5 kilograms of marijuana.[2]  Consistent with CW1's description, the marijuana was located under the sink.

11.  On the evening of April 4, 2011, CW1 met with VENIZELOS to discuss the loss of the marijuana that CW1 had obtained from VENIZELOS.  During that conversation, which was consensually recorded, CW1 explained to VENIZELOS that the marijuana had been taken by individuals who claimed to be law enforcement officers.  CW1 explained: "I had about almost five in dros, about seven in regs, and about fourteen to fifteen in cash."  VENIZELOS replied, "You only owe me thirty-five or something."  CW1 responded, "Yeah, I don't even know what it is."  VENIZELOS stated, "No - yeah, thirty-six and change."  CW1 agreed, "Yeah, like thirty-six and change."  VENIZELOS said, "I was going to say, just make it . . . I was going to say just take - Just take like 6,000 off, I mean."  Based on my training and experience, I know that

---

[2]   3.5 kilograms is equivalent to approximately 7.7 pounds.

-6-

"dros" and "regs" are specific types of marijuana, which have a street value of $4,000 per pound and $1,500 per pound, respectively.

12. Based, in part, on this information, on November 21, 2012, the Hon. Cheryl L. Pollak, U.S. Magistrate Judge for the Eastern District of New York, authorized an arrest warrant for VENIZELOS.

13. On the early afternoon of November 27, 2012, DEA agents approached the residence located at 24 Gateway Drive in Staten Island, New York. Based on surveillance by DEA agents, utilities checks, and a ruse telephone call, I learned that VENIZELOS was staying with his parents at SUBJECT PREMISES 1. DEA agents, including myself, knocked on the door and displayed our credentials when VENIZELOS came to the door. After VENIZELOS opened the door to the residence at 24 Gateway Drive, DEA agents, including myself, entered the residence and placed VENIZELOS under arrest. We then conducted a cursory sweep of 24 Gateway Drive, including SUBJECT PREMISES 1, to check for weapons. In the course of the sweep of SUBJECT PREMISES 1, I saw in plain view near the area where VENIZELOS' belongings appeared to be, a stack of an undetermined amount of United States currency laying on the bare floor in denominations of twenty dollar bills and one-hundred dollar bills, as well as two open bags. Inside of the open bags, I observed in plain view stacks of an undetermined amount of United

States currency, which were also in denominations of twenty dollar bills and one-hundred dollar bills. In the same vicinity, I also observed an envelope on which a series of figures and numbers were written. Based on my training and experience, I recognized this piece of paper to be a drug ledger.

14. As we were exiting the residence located at 24 Gateway Drive with VENIZELOS in custody, VENIZELOS' father stated to a DEA agent, in sum and substance, that VENIZELOS had been staying in the basement of 24 Gateway Drive (i.e., SUBJECT PREMISES 1).

15. VENIZELOS then provided DEA agents with the keys to his vehicle, a white Cadillac DTS with New York license plate FHE3673. Upon entering the vehicle, DEA agents observed in plain view another set of keys in the console of the vehicle.

16. Based upon information from CW1 that SUBJECT PREMISES 2 was VENIZELOS' primary residence, DEA agents drove to SUBJECT PREMISES 2, which was approximately one-half mile from SUBJECT PREMISES 1. Upon approaching the door to SUBJECT PREMISES 2, DEA agents, including myself, detected the strong odor of marijuana emanating from the door. We further observed surveillance cameras around the perimeter of the house. Specifically, we observed three surveillance cameras pointed at the door to SUBJECT PREMISES 2. After making these observations, we put the keys that had been recovered from VENIZELOS' vehicle into

the lock of the door of SUBJECT PREMISES 2.  The keys fit into the lock.  DEA agents asked VENIZELOS for consent to search SUBJECT PREMISES 2, to which VENIZELOS replied, in sum and substance, "If I go in there with you guys, then I'll end up dead."

17.  Based on my training, experience, and knowledge of this case, including the evidence discussed above, I know that:

a.  Persons engaged in narcotics businesses often use such financial methods as letters of credit, wire transfers, cash payments, cashiers checks, multiple bank accounts and other methods to conduct their business.  These techniques can be used to disguise the origin and movement of activity.

b.  Persons engaged in narcotics businesses often keep and maintain documents and other records, including, but are not limited to, bank records, memoranda, notes, correspondence, contracts, books of account, and financial records, investment records, work papers, canceled checks, drafts, money orders, safety deposit boxes, safes, cash and cash equivalents, facsimiles, fax machines, notebooks, and telephone and address records.

c.  Persons engaged in narcotics businesses, like legitimate business persons, often maintain and/or create business documents on computer and often use computers and other electronic or magnetic storage media, such as DVDs, "flash" drives, CD-ROMs and external hard drives to conduct their business, including to maintain records of payment and the transmission of electronic mail

messages to criminal associates. These records include (1) the e-mails, instant messages, or text messages of their criminal associates, (2) photographs and audio and video recordings of their criminal associates, controlled substances, and assets, and (3) electronic ledgers of narcotics and/or money, on any computers and electronic media storage devices they may own, and I know that, once put into these computers and storage devices, such records will remain unless affirmative steps are taken to delete them.

          d.   In a substantial number of residential searches executed in connection with the narcotics trafficking in which I have been involved, and in such searches conducted by other experienced law enforcement officers who have conveyed their experiences to me, the items described above have typically been recovered. See also United States v. Leung, No. 92 CR. 585 (JFK), 1992 WL 395592, *4 (S.D.N.Y. Dec. 15, 1992) ("The existence of a narcotics conspiracy supports the inference that drugs, paraphernalia, money, financial records, address books, and other items evidencing the defendants' [drug] distribution and its proceeds would be maintained at a location controlled by the defendants.").

          18.   In my experience, narcotics traffickers will typically continue to use locations to store drugs and money for long periods of time because of the difficulties in moving their operations. Moreover, specific information discussed above

demonstrates probable cause that the SUBJECT PREMISES has been used to store narcotics, narcotics proceeds, and other evidence of drug trafficking such as weapons, financial records and emails.

19. As described above and in Attachment A, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

20. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually

-11-

disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, computer storage media - in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21.  As further described in Attachment A, this application seeks permission to locate not only computer files that

might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search

-13-

warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

   c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes

it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

22.   In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.   As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to

-15-

obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

23. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant. The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion

24. Wherefore, it is respectfully requested that a search warrant be issued authorizing Special Agents from the DEA, with proper assistance from other law enforcement officials, to enter SUBJECT PREMISES 1 and SUBJECT PREMISES 2 to search for and seize narcotics, firearms, scales, cutting agents, other drug paraphernalia, wrapping materials, including plastic bags and rubber bands, discarded wrappers and other materials used to conceal and transport narcotics, money counters, machines used to package narcotics, surveillance equipment, telephones, SIM cards, currency, financial records, including rental agreements, utility bills, telephone bills and gas bills, car ownership records, safes, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and

records showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks, all of which constitutes evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, conspiracy to distribute and possess with intent to distribute narcotics.

ERIC TYLER
Special Agent
Drug Enforcement Administration

Sworn to before me this
27th day of November, 2012

THE HONORABLE VIKTOR V. POHORELSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK